**Peishu ZHENG, Appellant,**

v.

**QUEST DIAGNOSTICS, INC., Appellee.**

**No. 06–3569.**

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit
L.A.R. 34.1(a) Sept. 20, 2007.

Filed: Sept. 21, 2007.

Clifford E. Haines, Haines & Associates, Philadelphia, PA, for Appellant.

Robert H. Bernstein, Reed Smith, Newark, NJ, for Appellee.

Before: SLOVITER, SMITH, and GARTH, Circuit Judges.

## OPINION

GARTH, Circuit Judge:

Dr. Peishu Zheng appeals an order of the District Court granting Quest Diagnostics, Inc.'s, motion for summary judgment on his defamation and false light publicity claims. We exercise jurisdiction over this appeal under 28 U.S.C. § 1291. We will affirm.

### I.

Dr. Peishu Zheng is a board-certified dermatopathologist.[1] Quest Diagnostics, Inc. ("Quest"), hired Dr. Zheng on Novem-

---

1. A dermatopathologist is a specialist in diagnosing skin biopsies under a microscope.

ber 15, 1999, to analyze tissue under a microscope to diagnose diseases, including forms of skin cancer such as melanoma. In June 2002, Quest was notified of two claims (one filed lawsuit and one threatened lawsuit) arising from Dr. Zheng's alleged misdiagnosis of tissue slides. Both claims involved patients that Dr. Zheng diagnosed as not having melanoma. External and internal reexamination of the slides, though, revealed evidence of cancer that Dr. Zheng failed to properly diagnose.

In light of this, Quest conducted an independent analysis of approximately 600 pigmented lesion slides screened by Dr. Zheng from 1999 through June 2002. While this review was ongoing, a second lawsuit was filed against Quest arising out of Dr. Zheng's alleged failure to diagnose melanoma. Quest placed Zheng on administrative leave pending a more thorough examination of his work.

Quest then launched, at its sole expense, an independent panel of dermatopathologists to review every slide interpreted by Dr. Zheng during his employment with Quest. This involved the re-analysis of over 20,000 slides. The reviewing panel found at least some discordance with 79 of Dr. Zheng's interpretations. This constituted a discordance rate of .00395% (i.e., 70/20,000). According to Quest, the study revealed "at least two additional cases in which [Dr. Zheng] failed to report lesions suspicious for malignant melanoma or its pre-invasive precursor lesion, melanoma-insitu." Upon completing its investigation, Quest fired Dr. Zheng on October 8, 2002.

Under the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § § 11101–11152, medical entities are required to submit to the National Practitioner Data Bank ("NPDB") certain information concerning the professional competence and conduct of health care practitioners in their employ. The HCQIA established the NPDB and placed it under the control of the Department of Health and Human Services ("DHHS"). The NPDB is essentially an online-database created by the DHHS to share information on doctors who have adverse employment actions taken against them. Congress established the NPDB "to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101(2). The NPDB is not available to the general public. Only authorized medical health entities and professionals can access its information.

Reporting under the HCQIA is mandatory. A medical health entity that takes an adverse action against one of its employees must report this fact to the NPDB and state the reasons for the action. Pursuant to this requirement, Quest submitted an Adverse Action Report ("Report") to the NPDB. In the Report, Quest stated that "Dr. Zheng was terminated as a result of certain quality issues." Quest also selected action code "F–7," which corresponded to "substandard or inadequate skill level" as the basis for the action. This information then appeared on the NPDB's website.

On June 27, 2003, Dr. Zheng filed a five count complaint against Quest in the District of New Jersey. The complaint alleged that Quest's Report constituted defamation and false light invasion of privacy. The complaint also asserted claims based on breach of contract and breach of the covenant of good faith and fair dealing. Dr. Zheng thereafter voluntarily dismissed his claims alleging breach of contract and breach of the covenant of good faith and fair dealing, leaving only the defamation and false light counts.[2]

2. Dr. Zheng also asserted a count seeking an injunction based on the defamation and false

light claims. Since the success of this count

Quest then moved for summary judgment on these remaining counts. By order dated June 29, 2006, the District Court granted summary judgment in favor of Quest. The District Court held that Dr. Zheng presented no evidence that Quest's statements in the Report were false. Specifically, the District Court dismissed statistical evidence submitted by Dr. Zheng which purportedly established that his error rate was no different than his peers. On this point, the District Court noted:

Plaintiff contends that Quest's appraisal of his skill is false because Quest's own internal review discovered that his error rate was .35%, which, he argues, is lower than the average error rate of 1.76% for Quest pathologists. Plaintiff's assertion that Quest pathologists have an average error rate of almost 2%—thus, they misdiagnose one patient in fifty—is astonishing and lacks evidentiary support. In support, Plaintiff points to a piece of paper with a matrix of numbers on it. This piece of paper is not identified or authenticated in any way. Without more, it would not be admissible as evidence, and it does not constitute actual evidence that creates a genuine issue as to a material fact for trial. Even if this Court found it to be admissible, it is merely a cryptic matrix of numbers and does not clearly support Plaintiff's allegation.

The District Court then discussed certain expert reports submitted by Dr. Zheng. Specifically, the court addressed a report by Dr. Mark Wick, who performed a review of 77 of Dr. Zheng's cases at Quest. Dr. Wick found a significant difference of opinion with Dr. Zheng's analysis of 30 out of the 77 cases. The District Court stated that:

This is evidence of an error rate of 39%. Significantly, Wick does not state that this is evidence of the adequacy of Plaintiff's skill level. Presented with the evidence of record—especially a report of a review of Plaintiff's work in which an expert disagreed with 39% of Plaintiff's diagnoses—no reasonable jury could conclude that Quest made false statements about Plaintiff.

This appeal followed.

We have jurisdiction under 28 U.S.C. § 1332 (diversity) and 28 U.S.C. § 1291.

## II.

We review a District Court's grant of summary judgment de novo, and we apply the same standard that the District Court should have applied. *In re Color Tile, Inc.,* 475 F.3d 508, 512 (3d Cir.2007); *Penn. Coal Ass'n v. Babbitt,* 63 F.3d 231, 235 (3d Cir.1995). Summary judgment is properly ordered only if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Carrasca v. Pomeroy,* 313 F.3d 828, 832–33 (3d Cir.2002). Under Rule 56 of the Federal Rules of Civil Procedure, we "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Andreoli v. Gates,* 482 F.3d 641, 647 (3d Cir.2007) (citation omitted).

## III.

■ The elements of a defamation claim, in addition to damages, are: (1) the defendant made a defamatory statement of fact; (2) of or concerning the plaintiff; (3) which was false; (4) which was communicated to persons other than the plaintiff; and (5) there was fault.[3] *Feggans v. Bill-*

---

hinges entirely on the success of the defamation and false light claims, we will not address it separately.

**3.** New Jersey courts define "fault" as follows:

Where ... Plaintiff is a private figure and the speech is about an exclusively private concern, a traditional negligence standard of fault is applicable, which is defined as communicating the false statement while

*ington,* 291 N.J.Super. 382, 677 A.2d 771, 775 (N.J.Super.Ct.App.Div.1996) (citing *Bainhauer v. Manoukian,* 215 N.J.Super. 9, 520 A.2d 1154, 1166 (N.J.Super.Ct.App.Div.1987)).[4] Plaintiffs must satisfy their burden of proof for each of the elements of defamation by clear and convincing evidence. *Hornberger v. American Broadcasting Cos., Inc.,* 351 N.J.Super. 577, 799 A.2d 566, 578 (N.J.Super.Ct.App.Div.2002).[5]

In granting summary judgment in favor of Quest, the District Court held that Dr. Zheng failed to meet his burden of proving that Quest's statements in the Report were false. Dr. Zheng challenges this ruling on appeal. According to Dr. Zheng, evidence exists establishing his competency as a dermatopathologist. This evidence, he contends, creates a material issue of fact regarding the truth of Quest's statements in the Report. Therefore, as Dr. Zheng argues, the District Court erred in granting summary judgment.

The evidence Dr. Zheng relies upon is three-fold. First, he points to his low discordance rate of .00395% as determined by Quest's independent review panel. Dr. Zheng argues that this rate is extremely low when compared to other statistical evidence available. For instance, Dr. Zheng relies on a published report by Dr. Evan Farmer concluding that the average discordance rate amongst pathologists in general is 62%.[6] Dr. Zheng additionally relies on Quest's own error rate amongst pathologists, which is 1.76%.[7] According to Dr. Zheng, his relatively low discordance rate of .00395%, as compared to the rates in Dr. Farmer's report and Quest's own 1.76% error rate, establish his competency as a dermatopathologist.

Second, Dr. Zheng contends that his discordance rate may even be lower than .00395%. In support of this assertion, he relies on the report by Dr. Wick. As noted earlier, Dr. Wick conducted an independent review of the 77 out of 20,000 slides identified by Quest's panel.[8] Dr. Wick rat-

acting negligently in failing to ascertain the truth or falsity of the statement before communicating it. Fault may also be established by showing that defendant knows the statement is false and that it defames plaintiff or defendant acts with reckless disregard of its truth or falsity. *Feggans,* 677 A.2d at 775 (internal quotations and citations omitted).

4. Because this is a diversity lawsuit brought under 28 U.S.C. 1332, we must apply New Jersey law in assessing the merits of Dr. Zheng's defamation and false light claims. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

5. Zheng's false light invasion of privacy claim is similar to his defamation claim. The tort of false light requires Zheng to prove "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Romaine v. Kallinger,* 109 N.J. 282, 537 A.2d 284, 290 (1988). Since Dr. Zheng's claims of defamation and false light both hinge on the same element—the falsity of

the statements—we do not discuss them separately.

6. The District Court in reviewing the reports submitted by Dr. Zheng concluded that: "The letters of Drs. Farmer, Hartman, and Wick are critical of Quest and sympathetic to Plaintiff, but they do not show either that Plaintiff did not make any errors nor that his skill level was not inadequate."

7. Quest takes issue with these numbers. It contends that the .00395% error rate concerned a three-year review of specific diagnoses—i.e., pigmented lesions—he made as a dermatopathologist. In contrast, the 1.76% error rate was a one-year study which included *all* pathologists, was not limited to pigmented lesions, and only concerned 2.00% of randomly selected samples. Regardless, this dispute does not affect the outcome of this case.

8. Two of the 79 slides were immediately discounted because he could not confirm that Zheng initially reviewed those slides. Therefore, Wick actually only reviewed 77 slides.

ed 47 of the slides as either no difference in interpretation with Dr. Zheng or not clinically significant from that of Dr. Zheng. Therefore, Dr. Wick only disagreed with 30 slides. Dr. Zheng contends that based on Dr. Wick's review, the total number of "mistakes" made by Dr. Zheng was 30 out of 20,000—or an error rate of .0015%.

Finally, Dr. Zheng relies on numerous exemplary performance reviews he received while employed at Quest. Various employment reviews indicate that he received high ratings in terms of quality, integrity, accountability, collaboration, and leadership. The reviews also indicate that Dr. Zheng's work was consistently rated as exceeding expectation.

Dr. Zheng's reliance on these statistical sources and performance reviews misses the mark. As noted earlier, the Report contained only two statements by Quest. The first statement was in response to a query in the Report asking Quest to provide a "Description of Act(s) or Omission(s) or Other Reasons for Action Taken" regarding Dr. Zheng. In response to this query, Quest answered: "Dr. Zheng was terminated as a result of certain quality issues." The second statement was in response to a query asking Quest to state the "Basis for Action" against Dr. Zheng. In response to this question, Quest stated: "Substandard or Inadequate Skill Level."

The District Court correctly found that Dr. Zheng failed to raise any issue of fact as to the falsity of these statements. Here, the parties agree that Quest fired Dr. Zheng because of a "certain quality

issue"—i.e., his misdiagnosis of three patients. Furthermore, Quest clearly based that action on evidence it considered indicative of a substandard or inadequate skill level. Dr. Zheng does not come forth with any evidence showing that Quest did not actually fire him because of certain quality issues, or that Quest did not base that action on a finding of substandard skill levels. Because of this, Dr. Zheng failed to meet his burden on summary judgment to put forth evidence creating an issue of material fact.[9] Therefore, the District Court did not err in granting summary judgment in favor of Quest on the defamation and false light claims.

## IV.

■ Dr. Zheng also appeals the District Court's ruling on a discovery matter. On July 28, 2004, which was nearly one month after discovery closed on June 30, 2004, Dr. Zheng submitted a letter brief to the District Court seeking the deposition of Ms. Ann Cote. Ms. Cote is Quest's in-house counsel, and is the person who prepared and submitted the Zheng Report to the NPDB. Quest opposed this request by invoking attorney-client privilege and work product protection. On April 11, 2005, the District Court denied Dr. Zheng's request. Dr. Zheng now challenges this ruling, claiming that Ms. Cote's testimony could have raised a material issue of fact regarding the truth or falsity of Quest's statements in the Report. We review the District Court's denial of this discovery request for abuse of discretion.

---

9. The instant Dr. Zheng appeal is distinguishable from *Brown v. Presbyterian Healthcare Services*, 101 F.3d 1324 (10th Cir.1996). In that case, the court denied immunity to a defendant who submitted a report to the NPDB listing the *wrong reason* for a medical center's disciplinary action. In *Brown*, the report indicated that the disciplined doctor engaged in "negligence/incompetence/malpractice." The record, though, showed that the medical center never found the doctor was negligent, incompetent, or committed malpractice. Here, Quest indicated that Dr. Zheng was dismissed because of "substandard or inadequate skill level," which is an apt summary of the reasons Quest provided for the discharge.

*Camiolo v. State Farm Fire & Cas. Co.,* 334 F.3d 345, 354 (3d Cir.2003).

Federal Rule of Civil Procedure 56(f) provides that "[s]hould it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify that party's opposition, the court may refuse the application for judgment ... to permit ... depositions to be taken...." We have interpreted Rule 56(f) as requiring a party seeking further discovery in opposition to a summary judgment motion to file an affidavit specifying what information is sought, how it would preclude summary judgment if uncovered, and why it had not been previously obtained. *See, e.g., Dowling v. Philadelphia,* 855 F.2d 136, 139–40 (3d Cir. 1988). Furthermore, "[t]his circuit generally requires that a party file a Rule 56(f) affidavit in order to preserve the [discovery] issue for appeal." *Radich v. Goode,* 886 F.2d 1391, 1393 (3d Cir.1989) (citations omitted); *see also Bradley v. United States,* 299 F.3d 197, 207 (3d Cir.2002) ("[I]n all but the most exceptional cases, failure to file a Rule 56(f) affidavit is fatal to a claim of insufficient discovery on appeal.") (citing *Pastore v. Bell Telephone Co. of PA.,* 24 F.3d 508, 510 (3d Cir.1994)).

Although Dr. Zheng argues that Ms. Cote's testimony is critical to his defamation claim, the record reveals that he never filed a Rule 56(f) affidavit with his response to Quest's motion for summary judgment. " 'The purpose of the affidavit is to ensure that the nonmoving party is invoking the protection of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of the party's opposition." *Radich,* 886 F.2d

at 1394 (quoting *First Chicago Int'l v. United Exchange Co., Ltd.,* 836 F.2d 1375 (D.C.Cir.1988)). Since Dr. Zheng never filed a Rule 56(f) affidavit seeking a deposition of Ms. Cote, his present request to depose her is procedurally flawed.

Moreover, we do not consider assertions of inadequate discovery made in unverified legal memoranda, such as Dr. Zheng's letter brief, to meet the Rule 56(f) affidavit requirement. *See Bradley,* 299 F.3d at 207 (citing *Radich,* 886 F.2d at 1394). Even if we did, Dr. Zheng's letter brief here would not satisfy the requirements of Rule 56(f). Nowhere in his letter brief does Dr. Zheng state specifically what information was sought from Ms. Cote, how it would preclude summary judgment if uncovered, and why it had not been previously obtained. Accordingly, the District Court's discretion was properly exercised when it denied Dr. Zheng's untimely discovery.

### CONCLUSION

For the foregoing reasons, the District Court's order granting Quest's motion for summary judgment is affirmed.[10]

---

**10.** Our affirmance of the District Court's judgment in favor of Quest makes it unnecessary for us to address Quest's additional defenses of immunity from liability under the HCQIA, *see* 42 U.S.C. § 11137(c), and the special interest immunity provided by New Jersey's common law doctrine of qualified immunity, *see Govito v. W. Jersey Health Sys., Inc.,* 332 N.J.Super. 293, 753 A.2d 716, 720 (N.J.Super.Ct.App.Div.2000).